UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

___

TIMOTHY M. MEANS,

                          Plaintiff,

                    -vs-                                DECISION AND ORDER

NANCY A. BERRYHILL, *Deputy Commissioner of*      16-CV-6241-CJS
*Operations Performing the Duties and Functions*
*Not Reserved to the Commissioner of Social*
*Security*,

                        Defendant.

___

APPEARANCES

For Plaintiff:                        Scot G. Miller, Esq.
                                Coughlin & Gerhart, LLP
                                P.O. Box 2039
                                Binghamton, NY 13902-2039
                                (607) 723-9511

For Defendant:                   Elizabeth Rothstein, Esq.
                                Social Security Administration
                                26 Federal Plaza, Room 3904
                                New York, NY 10278
                                (212) 264-2536

                                Kathryn L. Smith, Esq.
                                U.S. Attorney's Office
                                100 State Street
                                Rochester, NY 14614
                                (585) 263-6760

## INTRODUCTION

**Siragusa, J.** Timothy Means ("Plaintiff") brings this action pursuant to Title II of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits. Presently before the Court are Plaintiff's amended motion for judgment on the pleadings, filed February 13, 2017, ECF No.

9, and the Commissioner's cross-motion for judgment on the pleadings, filed on April 11, 2017, ECF No. 12. For the reasons set forth below, the Court grants the Commissioner's motion, affirms the Commissioner's decision denying benefits, and denies Plaintiff's application.

## PROCEDURAL HISTORY

On October 22, 2012 Plaintiff filed an application for Title II benefits. R.182.[1] The application alleged an onset date of disability on July 14, 2012. R.14, 182. The Social Security administration denied the application on April 23, 2013. R.86.

Plaintiff requested and was granted a hearing before an Administrative Law Judge ("ALJ"). An initial hearing was held on August 6, 2014. R.14. A second hearing was held on December 8, 2014, for the testimony of a vocational expert. (R. 55). The ALJ then issued an unfavorable decision dated December 15, 2014. R.11. Plaintiff filed a timely Request for Review with the Appeals Council on January 26, 2015. R.7. The Appeals Council denied Plaintiff's request on February 25, 2016. R.1.

## FACTUAL BACKGROUND

Plaintiff testified at the initial hearing held on August 6, 2014. R. 35. At the time of the hearing, Plaintiff was 53 years old. R. 39. He had completed 10 years of school and obtained a GED. R. 39. Plaintiff also explained that he did not complete college because he had a learning disability. R. 39. In the last 15 years, Plaintiff worked in construction and worked at World Kitchen. (R. 40). The job at World Kitchen involved packing boxes and moving heavy objects. (R. 41). Plaintiff has not performed a desk job in the last 15 years. (R. 41).

Plaintiff has been seeing Dr. Meneses, his family physician, for his conditions. (R. 41). Dr. Meneses has been treating Plaintiff for bad feet, knees, hips and his lower back. He has

---

[1] References to the Certified Administrative Record, filed on December 12, 2016, ECF No. 7.

also been treating him for panic/anxiety, ADHD and obsessive-compulsive disorder. (R. 41). Plaintiff explained that Dr. Meneses is the medical professional most familiar with his conditions. R. 42. Plaintiff testified that he had seen psychiatrist Dr. Veena Garyali in 2012 for his ADHD, panic, and anxiety disorders, and he stopped seeing her when he lost his insurance. R. 42. Dr. Meneses continued to provide prescriptions for his psychotropic medications. R. 42. Plaintiff stated that he had an appointment in August to restart mental health treatment. R. 48. Plaintiff testified that his lower back was his main physical problem, and he explained that if he lifts more than 10 pounds, he pays for it later, as his back goes into severe spasms. R. 43-44. He stated that he was taking a muscle relaxer (Soma) and pain reliever (Norco) prescribed by Dr. Vidyasagar Mokureddy, who he saw for pain management, but has not continued to treat with this doctor because he lost his insurance at that time. R. 43-44. Plaintiff testified that he had problems with his feet, and that Dr. Meneses had administered hydrocortisone shots so that he could walk and perform his last job. R. 43. He stated that his knees were also bad, as they would lock up and sometimes become weak. R. 43. According to the Plaintiff, his hips were affected by his lower back and sciatic nerve. R. 43. Plaintiff testified that he had not yet filed a Workers' Compensation claim, but he wanted to file one. R. 43. Plaintiff testified that Dr. Meneses had recently given him a cane, in approximately January 2014, and he did not use a cane before that time. R. 44.

     Plaintiff also indicated that he has nerve damage in his right foot, a shattered knuckle in his left large toe, bad knees and a hip problem along with low back and sciatic nerve problems. R. 43. With regard to back pain, Plaintiff explained that it is in the lower lumbar area, across the lower back and that he also gets sharp pains between his shoulder blades like someone is stabbing him with a knife. R. 44. Plaintiff appeared at the hearing with the cane that Dr. Menesses had prescribed. R. 44.

3

Prior to 2014, Plaintiff suffered from a very severe panic and anxiety disorder, and, as a result did not feel safe in public and only felt safe at home. R. 45. He explained that his medications helped control the situation, but there were still times when the medications did not work and he ended up getting bad panic and anxiety disorder. R. 45. Plaintiff also has ADHD and OCD. R. 45. In terms of medications, Plaintiff was taking Lexapro, Abilify and Klonopin. R. 45. The medications help for a while but they wear off and he sometimes forgets to take his medications and needs reminders from his roommate. R. 45–46.

Plaintiff explained that his depression has gotten worse since he stopped working, and that he lost his job at World Kitchen because he missed too much time because of his depression, panic and anxiety disorder. R. 46. Plaintiff described his ability to deal with stress as not too good, since when, he gets stressed out, his panic and anxiety disorder really kicks in badly. R. 47. In terms of daily activities, Plaintiff indicated that his roommate does his grocery shopping and laundry and he really just sits around, watches TV and listens to music. R. 47. Plaintiff said that he does not drive a motor vehicle. R. 47. Further, Plaintiff indicated that he had alcohol problems in the past but has not used alcohol in 12 years. R. 47–48. Plaintiff explained that he had been treating with Steuben County mental health but the treatment stopped because he missed too many appointments, since he forgot them. R. 48.

In terms of physical activities, Plaintiff testified that he has a hard time sitting for long periods of time because of his sciatic nerve and hips. He explained that he can stand for 15 or 20 minutes and then he has to sit down. He can walk a block and his feet start throbbing. He further explained that he cannot run, lift or twist and was quite limited when it comes to physical activities. R. 48. To deal with the pain, Plaintiff uses a heating pad and sometimes ice. R. 48) During the day, Plaintiff will sit in bed and watch TV for 15 to 20 minutes, get up, walk around, do a few dishes, listen to music, build models and do some drawing. R. 49.

At World Kitchen, his last job, he had to lift 50 to 60 pounds. R. 50. When he previously worked at Walmart, he ran the floor machines and vacuumed carpets but there was not much lifting. R. 50. At Corning building company, Plaintiff did a lot of lifting because he had to stock the shelves and unload trucks and the weights he lifted were between 40 and 50 pounds. R. 51. When Plaintiff was seeking unemployment benefits, he was looking for jobs that he could do where he would not need to sit or stand for a long time but he could not find anything. R. 51. Plaintiff had told prospective employers that he had lifting limits and psychiatric problems. R. 51. Plaintiff had advised the prospective employers that he had a 10-pound lifting limit, since that is what Dr. Meneses told him. R. 51. Plaintiff explained that he was stressed out due to financial problems and was facing eviction. R. 52. Plaintiff had no earnings between 2005 and 2008 because he was in mental health treatment, went into rehab, and was going to AA to prevent drinking. R. 52. Plaintiff explained that he lives with his girlfriend who is disabled due to bipolar disorder. R. 52. Plaintiff's girlfriend does all the shopping and chores. R. 52.

Plaintiff has given conflicting accounts of why he stopped working. During a comprehensive mental health assessment on November 6, 2014, R. 753, he stated that he stopped his last job due to pain in his lower legs and feet, R. 749. However, he testified before the ALJ that World Kitchen laid him off:

> I missed too much time because of my depression and my panic and the anxiety disorder. There were times that I would lay in bed for three/four time -- three or four days at a time and they have an attendance policy. They laid me off and never called me back.

R. 46. During a November 5, 2014, appointment with Dr. Lucas, Plaintiff described his last job (in 2012). R. 752. Plaintiff stated that he had found it to be a "hostile work environment," and they dismissed him on purported grounds of abusing his FMLA leave when he stayed

5

home to be with his wife after she had made a suicide attempt. R. 752. Plaintiff recounted that he had not worked at World Kitchen for almost a year and suggested that he had lost that job because he was missing too much work due to his impairments. *See* R. 730; *see also* R. 46. However, Plaintiff admitted to Dr. Lucas that he had missed work because he was staying home to be with his sick wife (or girlfriend). *See* R. 752; *see also* R. 679 (describing company layoffs). Plaintiff stated that he collected unemployment benefits for 18 months until it ran out. R. 752.

At the end of the hearing, Plaintiff stated that he has a hard time being out in public, going in stores and shopping and that he only feels safe in his home and around his roommate. R 53. He stated that if he goes out, it is for a little while and then they go back home as he cannot be in public that long because of panic, anxiety and stress. R. 53.

The ALJ held a second hearing on December 8, 2014 for the testimony of a vocational expert. R. 55. The vocational expert testified that Plaintiff's past relevant work included jobs of truck loader and unloader, overnight cleaner and materials handler. R. 58–59). Plaintiff performed his past relevant work at the medium and heavy exertional levels. R. 58–59.

The ALJ asked the vocational expert a hypothetical question about an individual between 51 and 53 years of age, with a GED and one year of college who could perform the full range of light work as defined in the DOT, had the ability to understand and follow simple instructions and directions, perform simple and some complex tasks with supervision and independently, maintain attention and concentration for simple and some complex tasks, regularly attend to routine and maintain a schedule, can relate to and interact with others to the extent necessary to carry out simple tasks but should avoid work requiring more complex interaction or joint effort to achieve work goals and can handle reasonable levels of simple

6

work-related stress and can make occasional, simple decisions directly related to the completion of the tasks in a stable, unchanging work environment. R. 60–61.

The vocational expert replied that such an individual would not be able to perform Plaintiff's past relevant work. R. 61. The vocational expert identified jobs that such a person could perform such as a mail clerk, office helper and assembler of small products. R. 61–62. The vocational expert explained that most employers have an absentee policy that will permit a person to be absent a maximum of 2 days per month. R. 62. The vocational expert also testified that employers will tolerate 10% of time off task but that most employers will not tolerate 20% time off task so there is a bit of a gray area between 10 to 20%. R. 63.

Counsel for Plaintiff then asked the vocational expert to assume a hypothetical of an individual with Plaintiff's age, educational background, and work experience along with the limitation to light work as defined by the DOT and a further limitation that the person would have a marked impairment in the ability to relate adequately with others and appropriately deal with stress. R. 64–65. The ALJ then stated that counsel for Plaintiff had to define marked for her in positive terms to be compliant with the Regulations. R. 65. Counsel for Plaintiff stated (the transcript erroneously characterizes this as a statement from the vocational expert) that he was taking this from the consultative exam. R. 65. The ALJ then remarked that unfortunately the forms and the language used are not policy compliant so the RFC has to be what an applicant still can do. Consequently, the ALJ suggested that counsel state the question in positive terms such as frequently, continuously, never, rarely. R. 65. The vocational expert then testified that if such a person could only occasionally relate adequately with others and appropriately deal with stress that would not preclude the jobs identified. R. 65. The vocational expert agreed that an individual of Plaintiff's age, educational background, work experience who was limited to light work who had frequent deficiencies of concentration,

7

persistence or pace resulting in an inability to complete tasks in a timely manner would not be employable in any positions identified. R. 66–67. The vocational expert further testified that if an individual could only sit for 10 minutes at a time, stand for 5 minutes at a time and walk for 5 minutes at a time, it will be difficult for the individual to maintain any consistency in performing job duties. R. 67.

## SCOPE OF REVIEW

This Court reviews the Commissioner's decision to determine whether it is based upon correct legal standards and is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Brault v. Soc. Sec. Admin., Comm'r.*, 683 F.3d 443, 447 (2d Cir. 2012). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard means that once an ALJ finds facts, the Court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal citation omitted). The claimant generally bears the ultimate burden of proving that he was disabled throughout the period for which benefits are sought. 20 C.F.R. § 404.1512(a). The function of deciding whether a person is under a disability within the meaning of the Act belongs to the Commissioner. 20 C.F.R. § 404.1527(e)(1). The Commissioner has established a five-step procedure for evaluating disability claims. 20 C.F.R. § 404.1520. A claimant bears the burden of proof at steps one through four, at which point the burden shifts to the Commissioner to demonstrate that there is other work in the national economy that the claimant can perform. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

## DISCUSSION

Plaintiff argues that the ALJ failed to properly apply the treating physician rule, 20 C.F.R. § 404.1527 and SSR 96-2p, and that the ALJ's conclusion is not supported by substantial evidence in the Record.

*The ALJ's Residual Functional Capacity (Physical) Determination*

Plaintiff contends that the ALJ failed to provide good explanations as to why he gave little weight to the residual functional capacity ("RFC") opinion of Plaintiff's treating primary care doctor, Dr. Meneses, and erred when he gave the most weight to the vague consultative examiner opinion of Gilbert Jenouri, M.D. Plaintiff relies on the Second Circuit's holding in *Curry v. Apfel*, 209 F.3d 117 (2d Cir. 2000). In that opinion, the Circuit noted that the medical opinion in that case, which used terms such as "moderate" and "mild" to describe the plaintiff's RFC, was "so vague as to render it useless in evaluating whether [the plaintiff] can perform sedentary work." *Id*. at 123. However, as the district court in *Knudsen v. Colvin*, pointed out, "The real error made by the ALJ (and the district court) in *Curry*, however, was crediting that consulting physician's vague opinion over that of the plaintiff's orthopedist, whose opinion as to plaintiff's impairment 'contrast[ed] sharply with the [physician's] precise findings.'" *Knudsen v. Colvin*, No. 3:14-CV-00785 (CSH), 2016 WL 777899, at *4 (D. Conn. Feb. 29, 2016) (citation omitted); *see also Ashby v. Astrue*, No. 11 CIV. 02010 RMB DF, 2012 WL 2477595, at *12 (S.D.N.Y. Mar. 27, 2012), *report and recommendation adopted,* No. 11 CIV. 2010 RMB DCF, 2012 WL 2367034 (S.D.N.Y. June 20, 2012) ("In *Curry,* by contrast, it appears that the consulting physician conducted a more limited examination of the claimant and described his physical findings in more general terms. *Curry,* 209 F.3d at 120.").

In evaluating Plaintiff's allegations, the ALJ considered the treatment records and the reports of the consultative examiners, which were inconsistent with his allegations, as discussed above. *See* R. 27-28; 20 C.F.R. § 404.1529(c)(2) (consideration of objective medical evidence). Likewise, the ALJ considered that Plaintiff's symptoms improved with treatment, including medications. *See* R. 23-24, 28, 41, 45-46, 732, 734; 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (consideration of medication and other treatment). The ALJ also considered inconsistencies in Plaintiff's allegations, including his statements regarding his inability to drive—alleging to Cheryl Loomis, Ph.D., that it was because of his anxiety, while admitting to Dr. Garyali that it was because he could not have a driver's license until he paid his child support debt, and that he was able to walk everywhere. *See* R. 28, 679, 699; 20 C.F.R. § 404.1529(c)(4) (consideration of the extent of inconsistencies between a claimant's statements and the rest of the evidence). Plaintiff also admitted that he was laid off in July 2012 for reasons other than his impairments. *See* R. 679, 752; 20 C.F.R. § 404.1529(c)(3) (consideration of information about prior work record). Likewise, the ALJ considered that Plaintiff received unemployment benefits for 18 months until those benefits ran out, and he did look for work while receiving unemployment benefits, R. 46, which was inconsistent with his claim of disability. *See* R. 28, 46, 51, 225- 27, 678-79, 752; N.Y. Labor Law § 527 (unemployed individual shall be eligible to receive unemployment benefits only if he is able to work and is available for work); *Ruffino v. Colvin*, No. 13-CV-800, 2015 WL 9582704, at *8 (W.D.N.Y. Oct. 30, 2015) report and recommendation adopted, No. 13-CV-800, 2015 WL 9581786 (W.D.N.Y. Dec. 30, 2015) (citing *Jackson v. Astrue*, 2009 WL 3764221, at *8 (N.D.N.Y. 2009) ("although plaintiff's filing for and receipt of unemployment benefits while claiming to be disabled is not proof-positive that plaintiff was no longer disabled, the ALJ considered plaintiff's claim for unemployment benefits when assessing plaintiff's credibility")).

In addition, the ALJ considered that Plaintiff maintained activities of daily living, including performing some chores, socializing with his girlfriend, doing some shopping, and engaging in hobbies including playing drums and building diecast models. *See* R. 19-20, 28, 47, 49, 53, 698-99; 20 C.F.R. § 404.1529(c)(3)(i) (consideration of activities of daily living); *Lewis v. Colvin*, 548 F. App'x 675, 677 (2d Cir. 2013) (ALJ's RFC finding supported by substantial evidence including activities of daily living).

Dr. Meneses' restrictive December 2013 RFC opinion was not supported by his treatment notes, or any other medical evidence in the Record. Rather, his treatment notes reveal normal physical examinations in September 2013 and March 2014. Dr. Meneses noted in his March 10, 2014, examination report: "He appears to be doing fine. The clinical exam is unremarkable." R. 736. The ALJ's decision notes that Plaintiff began treating with a pain management specialist, Dr. Mokureddy, in September 2011. R. 22. A physical examination by Dr. Mokureddy's nurse on November 2, 2011, found "MUSCULOSKELETAL grossly normal tone and muscle strength; full, painless range of motion of all major muscle groups and joints." R. 673.

In *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x 29, 34 (2d Cir. 2013) (summary order), the Second Circuit approved of the use of the terms "mild" and "moderate" with respect to a doctor's description of a patient's physical limitations. There, the plaintiff challenged a consultative examiner's opinion (Dr. Toor) as incomplete and vague. The Second Circuit approved of the doctor's use of those terms, writing:

> Dr. Toor did not simply describe Tankisi's condition as "mild to moderate," *id.;* he provided additional clarifying information: "[m]ild to moderate limitation for sitting for a long time, standing for a long time, walking for a long distance, pushing, pulling, or heavy lifting. Her headache may interfere with her daily routine."

*Tankisi*, 521 F. App'x at 34. Here, Dr. Jenouri conducted a thorough examination[2] and wrote in his medical source statement, following a full physical examination on April 16, 2013: "Mild restrictions to walking, standing, sitting long periods, bending, stair climbing, lifting, and carrying." R. 695. Dr. Jenouri noted that "[t]he claimant appeared to be in no acute distress. Gait normal. Can walk on heels and toes without difficulty." R. 693. His musculoskeletal examination notes included: "Cervical spine shows full ROM bilaterally. Lumbosacral spine extension is 20 degrees; flexion 40 degrees; lateral flexion on the left 20 degrees, right 20 degrees; rotation right 25 degrees, left 25 degrees. SLR on the right is 30 degrees positive and left 30 degrees positive, both confirmed seated." R. 694. This compares favorably with the examination results accepted in *Tankisi*. The Court finds that the ALJ's RFC (Physical) determination is supported by substantial evidence in the Record.

*The ALJ's Residual Functional Capacity (Mental) Determination*

Plaintiff also challenges the ALJ's mental RFC finding because she gave the most weight to a non-examining psychologist, T. Inman-Dundon, PhD., and only some weight to consultative examiner Cheryl Loomis, Ph.D. In assessing Plaintiff's mental RFC, the ALJ wrote:

> Dr. Inman-Dundon determined that the claimant's mental impairment or combination of impairments had caused him to experience mild restrictions in his activities of daily living; mild difficulties in maintaining his social functioning; moderate difficulties in maintaining his concentration, persistence, or pace;

---

[2] For example, in the musculoskeletal portion of his examination report, he observed the following: "Cervical spine shows full ROM bilaterally. Lumbosacral spine extension is 20 degrees; flexion 40 degrees; lateral flexion on the left 20 degrees, right 20 degrees; rotation right 25 degrees, left 25 degrees. SLR on the right is 30 degrees positive and left 30 degrees positive, both confirmed seated. The shoulders have full ROM bilaterally. The elbows have full ROM bilaterally. The wrists have full ROM bilaterally. The hands have full ROM bilaterally. Hip flexion/extension on the right is 90 degrees, left 90 degrees; rotation interior right 30 degrees, left 30 degrees; exterior right 40 degrees; left 40 degrees; backward extension right 30 degrees, left 30 degrees; abduction right 35 degrees, left 35 degrees; adduction right 15 degrees, left 15 degrees. Knee flexion/extension is full ROM bilaterally. Ankle dorsiflexion on the right is 15 degrees, left 15 degrees; plantar flexion right 35 degrees, left 35 degrees. No evident subluxations, contractures, ankylosis, or thickening. Joints stable and nontender. No redness, heat, swelling, or effusion." R. 694.

and no repeated episodes of decompensation, each of extended duration (Exhibit 2A).

R. 21. The ALJ noted that Dr. Inman-Dundon also reviewed the consultative examination by Dr. Loomis. R. 26. The ALJ found that Dr. Inman-Dundon's assessment was "consistent with the claimant's mental health treating history during the period at issue." R. 27. The ALJ also noted that she was giving greater weight to Dr. Inman-Dundon's assessment, over Dr. Loomis' assessment, because "in addition to being able to review the opinion of Dr. Loomis, Dr. Inman-Dundon was also able to examine the other evidence of record." R. 27. Dr. Inman-Dundon's complete report is this:

> **MRFC - Additional Explanation**
>
> 52 year male cmt w/ allegations of depression, anxiety, panic d/o, and ADHD. Cmt has a GED, 1 year of college, and worked as a warehouse handler for 2 1 / 2 years until 2012.
>
> At the CE, cmt reports attending outpatient mental health treatment w / Dr Garyali once every 2 weeks, but evidence reveals clmt saw psychiatrist about every few months, With last note from 10/ 12. Clmt is not taking any psychotropic med currently. Stopped taking Klonopin one week ago Last inpatient psychiatric in admit 1980's. Cmt reports dysphoria, difficulties concentrating and symptoms of anxiety for 2 to 3 weeks. History of drug and alcohol abuse.
>
> Dr Garyali TS-MD 10 / 31/2012 MSE affect appropriate. Mood anxious. Eye contact ok Anxiety level ok Insight and judgment limited. Cmt got fired collecting unemployment he was told he was laid off He can't afford Abilify. Dr Garyali told him that I did not think he would qualify for SSDI for psychiatric issues. He has been off Abilify for a long time. 8/2012 MSE affect appropriate. Mood euthymic. He can't have a driver's license till all CS is paid off He walks everywhere. Stable.
>
> At CE MSE cooperative. Overall social skills adequate. Adequately groomed. Eye contact appropriate. Affect dysphoric an anxious. Mood dysthymic. Cmt's attention and concentration mildly impaired. Memory skills mildly to moderately impaired. Intellectual fnc estimated below average. Insight poor.
>
> Cmt is able to dress, bathe and groom himself daily. He cooks, prepares his own food and does cleaning and laundry. Cmt states he sometimes does not have the motivation to do cleaning and laundry, cooking and his girlfriend will do these tasks. He enjoys playing the drums and spends his day listening to music and watching TV. Cmt does not drive due to unpaid Child Support. He

> walks everywhere.
>
> Dr Loomis CE-PHO moderate impairment in performing simple tasks independently, maintaining attention, concentration and making appropriate decisions. Marked impairment in performing complex tasks, relating w / others and appropriately dealing w / stress. this MSO has been considered.
>
> Cmt is able to understand and follow simple and some detailed instructions. He would be able to perform simple and some complex tasks. Clmt has some difficulty sustaining attention r /t psych condition, but it is not at the marked level. Clmt is able to maintain a regular schedule and relate adequately with others, and adapt to changes in a routine work setting.
>
> These findings complete the medical portion of the disability determination.

R. 81–82. Dr. Loomis examined Plaintiff on April 16, 2013, and completed a report. R. 696–700. Her medical source statement states:

> The claimant exhibited no impairment in his ability to follow and understand simple directions and instructions I maintain a regular schedule, and learn new tasks. The claimant exhibited moderate impairment in his ability to perform simple tasks independently, maintain attention and concentration, and make appropriate decisions. The claimant exhibited marked impairment in his ability to perform complex tasks independently or under supervision, relate adequately with others, and appropriately deal with stress.
>
> The results of the present examination appear to be consistent with psychiatric problems and this may significantly interfere with the claimant 1 s ability to function on a daily basis

R. 699. The ALJ wrote that, "It is clear that the portion of the opinion by Dr. Loomis was based solely on the claimant's subjective report regarding the history of his symptoms and functional limitations, rather than on any objective or contemporaneous findings made by Dr. Loomis in her one-time examination of the claimant." R. 27. Further, the ALJ noted that Dr. Loomis' opinion that Plaintiff had marked limitations in social functioning and dealing with stress was belied by the Record evidence that he lived with a girlfriend who suffers from bipolar illness "with whom the claimant is still able to get along, and that the claimant has been appropriate at all his medical appointments." R. 27. Here the ALJ based her conclusion concerning Plaintiff's mental RFC on a review of the entire record and the Court finds that her conclusion

is supported by substantial evidence.

*The ALJ's Credibility Assessment*

Plaintiff relies on case law prevalent in the Eastern District which holds that an ALJ errs when he announces his RFC determination before conducting the assessment required of a claimant's credibility. *See, e.g., Box v. Colvin*, 3 F. Supp. 27, 47 (E.D.N.Y. 2014) ("the ALJ announced his RFC assessment and then wrote that [the Plaintiff] statements were not credible to the extent they were inconsistent with that RFC assessment.") (citation and internal quotes omitted). However, the Commissioner cites to *Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) in which the Circuit wrote: "After extensively detailing the medical evidence and Penfield's testimony, the ALJ afforded her statements only 'partial credibility' because 'they were inconsistent with the objective evidence in the record.'" The Second Circuit, after conducting its own review, found that the record supported the ALJ's conclusion. Here, the ALJ wrote that in making her RFC finding, she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence…." R. 22. The ALJ also cited to specific evidence that failed "to bolster the claimant's credibility." R. 28. The Court does not find it significant that the ALJ wrote her conclusion as the heading for the portion of her decision concerning Plaintiff's credibility and finds that the Record supports the ALJ's credibility determination.

*Vocational Expert Testimony*

Plaintiff questions the validity of the vocational expert's testimony because the ALJ failed to follow SSR 00-4p to determine whether that testimony was consistent with the Dictionary of Occupational Titles ("DOT"). The Commissioner points out that the ALJ specifically asked the vocational expert:

15

> All right, now I'm going to give you a hypothetical question. In your answer please refer to any jobs that you might name as found in the Dictionary of Occupational Titles and if your answer conflicts in any way with the DOT would you please identify that conflict for me and give me the source of your information.

R. 59. The ALJ noted in her decision that "the conclusions of vocational expert DiStefano are derived from information contained in the DOT and are not in conflict with the DOT or the Selected Characteristics of Occupations (SSR 00-4p)." R. 31. Plaintiff has not raised any examples of where the vocational expert's testimony conflicted with the DOT. SSR 00-4p requires only that the ALJ "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and" the DOT. In addition, the ruling states:

> When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p. The ALJ did that here.

## CONCLUSION

For the reasons stated above, the Court denies Plaintiff's motion, [ECF No. 9](ECF No. 9), and grants the Commissioner's motion, [ECF No. 12](ECF No. 12). The Commissioner's decision is affirmed. The Clerk will enter judgment and close the case.

IT IS SO ORDERED.

DATED: November 30, 2018
        Rochester, New York

                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge